# In the United States Court of Federal Claims

No. 14-589C
Filed: July 15, 2014
Reissued: July 18, 2014[1]

```
* * * * * * * * * * * *
```

|  |  |  |
|---|---|---|
| **ORBIS SIBRO, INC.** | * |  |
|  | * | Bid Protest; Jurisdiction; Task |
| **Protestor,** | * | Orders, Federal Acquisition |
| v. | * | Streamlining Act, 10 U.S.C. |
|  | * | § 2304c(e). |
| **UNITED STATES,** | * |  |
|  | * |  |
| **Defendant.** | * |  |
|  | * |  |

```
* * * * * * * * * * * *
```

**Jerome S. Gabig, Jr.**, Wilmer & Lee, P.A., Huntsville, Alabama, for protestor. With him were **Richard J.R. Raleigh, Jr.** and **Andrew D. Dill,** Wilmer & Lee, P.A., Huntsville, Alabama.

**David Levitt**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Franklin E. White, Jr.**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Stuart F. Delery**, Assistant Attorney General. Of counsel, **Diane-Marie Carrero**, Counsel, NAVSUP Fleet Logistics Center Norfolk, Philadelphia, Pennsylvania.

**O P I N I O N**

### HORN, J.

On July 11, 2014, protestor, Orbis Sibro, Inc. (Orbis), filed a bid protest in this court challenging the United States Department of the Navy's (Navy) assessment of Orbis' proposal to the SeaPort Solicitation N00024-14-R-3154 (the Solicitation) issued by NAVSUP FLC Norfolk, Detachment Philadelphia, PA and the Navy's award of SeaPort Task Order N00178-14-D-7806-EX01 to

---

[1] This opinion was issued under seal on July 15, 2014. On July 16, 2014, the court inquired of both parties whether either party required redactions to the opinion. A joint status report filed on July 18, 2014 indicated no such redactions were requested.

Logistics Support Inc. (LSI).[2] In its protest, Orbis describes the Solicitation as a solicitation for "a cost plus fix fee task order contract" for which Orbis was the incumbent contractor. According to the protest, the Solicitation dealt with support services to NAVSUP Acquisition Logistics Program Office's mission of "maintaining continuity of ship design, systems engineering, and related cost and readiness factors." According to the protest, the awardee was to provide support and assistance in monitoring factors related to the mission, including "technical performance, productivity, operability, and supportability of configuration & technical data management, and support to the development & execution of common strategies and approaches to weapon systems life-cycle logistics."

The Solicitation set forth the "TYPE OF CONTRACT (FAR [Federal Acquisition Regulation] 52.216-1) (APR 1984)" (capitalization in original) and that "the Government contemplates award of one CPFF [cost plus fix fee] task order resulting from this solicitation." The Solicitation indicates "Periods of Performance" for "Base Labor" between July 16, 2014 to July 15, 2015, with two options for the subsequent years. Moreover, the Solicitation references the basic contract, providing that "**[a]ll provisions and clauses of Section I of the basic contract apply to this task order (unless otherwise specified in the task order)**." (emphasis in original). In addition to this reference, Section K of the Solicitation references the basic multiple award contract indicating:

> The requirement for Annual Representation and Certifications at 52.204-8 applies at the basic multiple award contract (MAC) level for each Offeror. Offerors are not required to submit representation or certifications in response to this solicitation or its subsequent Task Order award, if any. All requests for representation or rerepresentation shall come from the MAC Contracting Officer in accordance with the terms of the basic contract.

The provision for "EVALUATION CRITERIA AND THE BASIS FOR AWARD" (capitalization in original) in the Solicitation provides: "[t]his task order is reserved for only those contractors, which have {National Capital Zone-2} identified in section B of the MAC contract. Quotes from other contractors will not be considered."

The SeaPort, US Navy website homepage describes SeaPort-e as:

> the Navy's electronic platform for acquiring support services in 22 functional areas including Engineering, Financial Management, and Program Management. The Navy Systems Commands (NAVSEA, NAVAIR, SPAWAR, NAVFAC, and NAVSUP), the Office of Naval Research, the United States Marine Corps, and the Defense Threat Reduction Agency (DTRA) compete their service requirements

---

[2] LSI did not intervene in the above captioned protest.

amongst 1800+ SeaPort-e IDIQ multiple award contract holders. The SeaPort-e portal provides a standardized, efficient means of soliciting offers from amongst the diverse population of large and small businesses and their approved team members. All task orders are competitively solicited, awarded and managed using the SeaPort-e platform.

SeaPort – U.S. Navy, http://www.seaport.navy.mil (last visited July 15, 2014); see also Solute Consulting v. United States, 103 Fed. Cl. 783, 784 (2012) (SeaPort-e is "a multiple award contract vehicle, to acquire support services in twenty-two functional areas. Under the program, the Navy has awarded over 1,800 indefinite-delivery, indefinite-quantity contracts . . . ." (internal citations omitted)).

Orbis timely submitted its proposal on April 4, 2014. On June 13, 2014, Orbis indicated it received an email that the "award had been made to Logistics Support Inc. ('LSI') based on the Navy's estimate of $6,133,033." Protestor alleges that LSI's proposal price was $6,133,033.00 and was evaluated at $6,235,004.00, whereas Orbis' proposal price was $4,992,529.00 and was evaluated at $5,686,225.00. During the July 11, 2014 initial hearing, defendant confirmed that award was made on June 13, 2014 and indicated a debriefing was conducted with Orbis on June 17, 2014. After the debriefing, the contracting officer answered additional questions via email and the debriefing was closed on June 18, 2014.

Orbis seeks injunctive relief to preclude the Navy from "directly or indirectly awarding the contract to LSI"[3] and to direct the Navy "to suspend LSI's performance of the contract pending resolution" of the protest. Orbis asks the court to declare the Agency's action with respect to the proposal submitted by Orbis as arbitrary, capricious, and an abuse of discretion and to stop the Agency from proceeding with the contract awarded to LSI. Protestor also requests award of its "reasonable attorneys' fees, court costs, interest, proposal preparation expenses, and expenses in prosecuting this action or as otherwise recoverable."

At the July 14, 2014 hearing, protestor's counsel agreed that each of the nine counts in protestor's complaint only challenge the agency evaluation of Orbis' proposal. Count I alleges that the Navy failed to follow the evaluation criteria because it should not have conducted an upward adjustment to Orbis' cost proposal to account for straight time because Orbis had "already included 100% straight time" into its proposal. Count II alleges that "the Navy evaluators never determined that Orbis' proposed costs were unrealistic" prior to applying the cost-realism analysis to the upward price adjustment, which violated Section

---

[3] The task order actually was awarded to LSI on June 13, 2014, prior to the filing of the protest.

M of the Solicitation. Count III alleges: "The Navy's Upward Adjustment Of Orbis's Cost Proposal Based On Uncompensated Overtime Concerns Cannot Withstand Scrutiny," (capitalization in original), insofar as protestor's proposal decided to include uncompensated overtime, pursuant and compliant to FAR clause 52.237-10 and as permitted by the Solicitation. Count IV alleges that the Navy violated FAR 15.306(a)(2) by considering adverse information on Orbis' Past Performance without giving Orbis an opportunity to respond. Count V alleges the evaluator failed to give meaningful consideration to the Contractor Performance Assessment Reporting System (CPARS) report for Orbis' three most relevant contracts, which were allegedly positive and contradicted the adverse past performance information from Past Performance references listed by Orbis. Count VI alleges that, because the work for this Solicitation and the work Orbis performed under the predecessor contract are "strikingly similar," it was arbitrary, capricious, and an abuse of discretion for the evaluators not to have treated Orbis' corporate experience as "very relevant." Count VII alleges that the best value decision was fundamentally flawed, insofar as the evaluation criteria established "Price Submission" as the most important criteria and "Orbis's cost proposal was more than 22% less costly than LSI's," in addition to the improper evaluation on relevant experience and past performance.[4] Count VIII requests declaratory judgment consistent with protestor's prayer for relief. Finally, Count IX requests both a preliminary and permanent injunction, citing "great and irreparable injury to Orbis, including, without limitation, the loss of significant revenues, lost profit, lost work, the loss of employees, and the loss of opportunity to remain involved for this and other similar procurements."

On July 11, 2014, the same day Orbis filed its protest, this court held an initial hearing regarding Orbis' protest, during which defendant indicated it would challenge the court's jurisdiction because the Federal Acquisition Streamlining Act (FASA)[5] poses a jurisdictional bar to the protest of task orders. Given the inability of the Agency to address the relevant issues of contract scheduling at the July 11, 2014 hearing, and due to the impending July 16, 2014 date of projected contract performance, on July 11, 2014, the court ordered the parties to conduct simultaneous briefing on the jurisdictional issues. On July 13, 2014, defendant filed a motion to dismiss for lack of subject matter jurisdiction. Protestor responded and the court held a hearing on July 14, 2014. Protestor's counsel stated at the hearing that the claims brought by Orbis were in the nature of a "straight bid protest."

---

[4] The Solicitation in Section M provided: "The Government's evaluation of quotes will consider the quoter's Technical Submission more important than the Past Performance Submission and the Technical Submission and Past Performance Submission combined are more important than the Price Submission."

[5] Pub. L. No. 103-355, § 1004, 108 Stat. 3243, 3252-53 (1994) (codified as amended at 10 U.S.C. § 2304c(e) (2012) and 41 U.S.C. § 4106(f) (2012)).

In its motion to dismiss, defendant argues that, pursuant to FASA, this court lacks jurisdiction to consider protests of delivery order[6] contracts because defendant argues that "Orbis concedes that its complaint is a protest of a delivery order issued pursuant to the SeaPort-e Program." Defendant notes that "[t]he delivery order in this protest is under $10,000,000" and that Orbis' claims are limited to protesting the Navy's evaluation of the proposal submitted by Orbis for a delivery order contract and "does not specifically allege that the protest is within one of the exceptions in FASA allowing judicial review of delivery orders."

On July 14, 2014, protestor filed a short, confused response to the motion to dismiss and characterized its protest as "devolv[ing] to three alleged mistakes made by the Navy evaluators leading to an ostensibly flawed best value decision." Protestor describes the mistakes as:

#1. Under the guise of cost realism, the evaluators wrongfully increasing [sic] Orbis's cost proposal from $4,992,529 to $5,686,225 based on the evaluators [sic] mistaken belief that an upward revision was warranted for uncompensated overtime.

#2. The evaluators failed to assess Orbis's corporate experience as "very relevant" notwithstanding that, as the incumbent, the work that Orbis had been performing and the work set forth in the solicitation are strikingly similar.

#3. The evaluators did not give material consideration to the applicable Contractor Performance Assessment Reporting System ("CPARS") reports but instead used unreliable past performance information that Orbis had not been given an opportunity to rebut.

Protestor bases its opposition on only one case, MED Trends, Inc. v. United States, 102 Fed. Cl. 1 (2011) appeal dismissed, 464 F. App'x 899 (Fed. Cir. 2012), and argues:

At The End Of The Sunset Provision In Section 843 Of The 2008 NDAA [National Defense Authorization Act], The Limits On The Court's Jurisdiction Under FASA (e.g., 10 U.S.C. § 2304c) Concerning Task and Delivery Order Procurements Were Removed

---

[6] Protestor references the contract at issue in the above captioned case as a "task order," specifically a "cost plus fix fee task order contract." In the motion to dismiss, defendant references the contract as both a "delivery order" and a "cost-plus-fixed-fee task order." The Solicitation indicates under "TYPE OF CONTRACT" (capitalization in original) that the Solicitation is for "one CPFF [cost plus fixed fee] task order." Defendant does not explain its use of different terms than the protestor or the Solicitation.

> Thus Restoring The Court's General Jurisdiction Under 28 U.S.C.
> § 1491(b)(1)."

(capitalization in original). Protestor argues that section 843 of the 2008 NDAA added a sunset provision to 10 U.S.C. § 2304c; and claims, therefore, § 2304c(e) is no longer in effect after May 27, 2011 and the Court's general jurisdiction over task and delivery order procurements under 28 U.S.C. § 1491(b)(1) is restored. Protestor cites the <u>MED Trends</u> decision as a "dispositive decision by the Court of Federal Claims on whether the literal interpretation of 'subsection' in (e)(3) of Section 843 of the 2008 NDAA is correct."

Protestor recognizes that <u>MED Trends</u> addresses a civilian procurement against the Department of Labor (DOL) and that "[t]he applicable FASA-era statute for the DOL is 41 U.S.C. § 4106(f)(3)" yet the "applicable FASA-era statute [for the current protest] is 10 U.S.C. § 2304c." Protestor indicates "[n]evertheless, in both instances, the focus is on the subset entitled 'Protests' whether it be 41 U.S.C. § 4106(f) or 10 U.S.C. § 2304c(e)." Protestor argues that the interpretation of the sunset provision in <u>MED Trends</u>, indicates, "[t]he bottom line is that the Court has previously addressed the basis for the Government's motion to dismiss in *Med* [sic] *Trends*" and, "[u]nder the Court's reading of the sunset provision of the 2008 NDAA, the GAO's exclusive jurisdiction expired as of May 27, 2011." Protestor also cites a June 14, 2011 GAO decision for the same conclusion as in the <u>MED Trends</u> decision (citing <u>Technatomy Corp.</u>, B-405130, 2011 WL 2321836 (Comp. Gen. June 14, 2011.)).[7]

---

[7] Protestor's arguments on the sunset provision are confused, which protestor's counsel acknowledged at the July 14, 2014 hearing. <u>MED Trends</u> discusses 41 U.S.C. § 4106(f) and civilian contracts, whereas this protest is a defense contract that falls under 10 U.S.C. § 2304c. As authority subsequent to <u>MED Trends</u> recognizes, "[i]n January 2011, before the sunset date, Congress extended the sunset date with respect to the FASA provision limiting the protests of *defense* agency task or delivery orders." <u>Wildflower Int'l, Ltd. v. United States</u>, 105 Fed. Cl. 362, 372 (2012) (emphasis in original) (citing Ike Skelton National Defense Authorization Act for Fiscal Year 2011 ("2011 NDAA"), Pub. L. No. 111-383, § 825, 124 Stat. 4137, 4270). The 2011 NDAA provided: "Paragraph (3) of section 2304c(e) of title 10, United States Code, is amended to read as follows: '(3) Paragraph (1)(B) and paragraph (2) of this subsection shall not be in effect after September 30, 2016."  Pub. L. No. 111-383, § 825, 124 Stat. at 4270. Section 2304c(e), however, even more recently, was amended in 2013 to remove the sunset provision altogether. <u>See</u> National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239 § 830, 126 Stat. 1632, 1842 (codified as amended at 10 U.S.C. § 2304c(e)) ("Section 2304c(e) of title 10, United States Code, is amended by striking paragraph (3)"). In addition, although there are different sunset provisions that apply to 41 U.S.C. § 4106(f) for civilian contracts, even under the current version of section 4106(f), the sunset provision is not expired, insofar as it appears to have been extended to September 30,

**DISCUSSION**

It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 131 S. Ct. 1197, 1202 (2011); see also Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990))); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y & H Corp., 546 U.S. at 506; see also Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise sua sponte, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006).

---

2016. See National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81 § 813, 125 Stat. 1298, 1491 (codified as amended at 10 U.S.C. 4106(f)) ("Paragraph (3) of section 4106(f) of title 41, United States Code, is amended to read as follows: '(3) EFFECTIVE PERIOD.--Paragraph (1)(B) and paragraph (2) of this subsection shall not be in effect after September 30, 2016.'").

When deciding a case based on a lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56 (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1 (2002)))); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982), recognized by Davis v. Scherer, 468 U.S. 183, 190, reh'g denied, 468 U.S. 1226 (1984); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

FASA includes a provision that generally limits the court from adjudicating protests "in connection with the issuance or proposed issuance of a task or delivery order" except under limited exceptions stated in the statute, as discussed below. Pub. L. No. 103-355, § 1004, 108 Stat. 3243, 3252-53 (1994) (codified as amended at 10 U.S.C. § 2304c(e) and 41 U.S.C. § 4106(f));[8] see also BayFirst Solutions, LLC v. United States, 104 Fed. Cl. 493, 502 (2012) ("This court has consistently interpreted the ban as prohibiting task order protests in this court on any grounds other than the specific excepted allegations of excessive scope, period or value of the proposed task order."); Solute Consulting v. United States, 103 Fed. Cl. at 793-94 (finding that the protestor's "challenges reflect only its disagreement with the manner in which SPAWAR evaluated the task order proposals" and concluding, "[b]ecause the exception to the task order protest bar does not encompass challenges to proposal evaluations, the court lacks the authority to entertain [the] protest."); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1374 (Fed. Cir. 2009) (Dyk, J., dissenting) ("To be sure, 10 U.S.C. § 2304c(e)(1) provides that '[a] protest is not authorized in connection with the *issuance of a task order or delivery order* except for—(A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or (B) a protest of an order valued in excess of $10,000,000.' But the statute does not limit protests of an overall solicitation or IDIQ contract; it only limits challenges to the task order or delivery order.") (emphasis and alteration in original; citation omitted). Protestor alleges, and defendant agrees, the current dispute addresses a task order awarded by the United States Department of the Navy.

---

[8] 41 U.S.C. § 4106(f) was codified at 41 U.S.C. § 253j.

The analysis of this dispute falls under Section 2304c of Title 10 of the United States Code. See also BayFirst Solutions, LLC v. United States, 104 Fed Cl. at 502 n.6. FASA provides at 10 U.S.C. § 2304c(e):

> (e) PROTESTS.—(1) A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order
>
> except for—
>
>> (A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or
>>
>> (B) a protest of an order valued in excess of $10,000,000.
>
> (2) Notwithstanding section 3556 of title 31, the Comptroller General of the United States shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).[9]

10 U.S.C. § 2304c(e) (2012) (as amended by National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239 § 830, 126 Stat. 1632, 1842). A task order contract is defined as "a contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract." 10 U.S.C. § 2304d(1) (2012). A delivery order contract is defined as "a contract for property that does not procure or specify a firm quantity of property (other than a minimum or maximum quantity) and that provides for the issuance of orders for the delivery of property during the period of the contract." 10 U.S.C. § 2304d(2) (2012).

The Competition in Contracting Act (CICA) requires that procurements "obtain full and open competition for the procurement[.]" 10 U.S.C. 2304(a)(1)(A) (2012) ("Except as provided in subsections (b), (c), and (g) and  except in the case of procurement procedures otherwise expressly authorized by statute, the head of an agency in conducting a procurement for property or services . . . shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation[.]"). In 1994, Congress passed FASA to simplify and streamline the federal acquisition process in order to yield a more efficient system. See S. Rep.

---

[9] FASA requires agencies to appoint or designate a senior agency official independent from the contracting officer to serve as "a task and delivery order ombudsman who shall be responsible for reviewing complaints from the contractors on such contracts and ensuring that all of the contractors are afforded a fair opportunity to be considered for task or delivery orders when required under subsection (b)."  10 U.S.C. § 2304c(f).

103-258, at 1 (1994), reprinted in 1994 U.S.C.C.A.N. 2561, 2561. "The Committee intends that all federal agencies should move to the use of multiple task order contracts, in lieu of single task order contracts, wherever it is practical to do so." S. Rep. 103-258, at 15, 1994 U.S.C.C.A.N. 2561, 2576. The report of the Senate Committee on Governmental Affairs explains:

> The new provisions . . . are intended to given [sic] agencies broad discretion in establishing procedures for the evaluation and award of individual task orders under multiple award contracts. They do not establish any specific time frames or procedural requirements for the issuance of task orders, other than that there be a specific statement of work and that all contractors under multiple award contracts be afforded a reasonable opportunity to be considered in the award of each task order (with narrow exceptions). Accordingly, contracting officials will have wide latitude and will not be constrained by CICA requirements in defining the nature of the procedures that will be used in selecting the contractor to perform a particular task order. When contracting officials award task orders they will have broad discretion as to the circumstances and ways for considering factors such as past performance, quality of deliverables, cost control, as well as price or cost.

S. Rep. 103-258, at 16, reprinted in 1994 U.S.C.C.A.N. 2561, 2576.

FASA also "provides that when an agency makes an order pursuant to a task or delivery order contract, the agency is not required to publish a notice of solicitation nor is it required to hold a 'competition . . . that is separate from that used for entering into the contract.'" Corel Corp. v. United States, 165 F. Supp. 2d 12, 20 (D.D.C. 2001) (quoting 41 U.S.C.A. at § 253j(a)(2)) (omission in original); see also DataMill, Inc. v. United States, 91 Fed. Cl. 740, 751-53 (2010) (discussing the legislative history of FASA); Global Computer Enters., Inc. v. United States, 88 Fed. Cl. 350, 404-05 (discussing the legislative history of FASA), opinion modified on recons. 88 Fed. Cl. 466 (2009) (addressing other matters); A & D Fire Protection, Inc. v. United States, 72 Fed. Cl. 126, 133-34 (2006) ("This court cannot frustrate the intent of Congress, which was to exempt from protest the issuance of individual task orders to contractors who had already received awards, subject to protest, of their master IDIQ contracts. In the place of agency protests, Government Accountability Office (GAO) protests or judicial review, Congress saw fit to offer disappointed task order bidders recourse to the agency's task and delivery order ombudsman.").

"In other words, once the task or delivery order contract itself has been obtained through full and open competition, orders made pursuant to that contract are immune from CICA's full and open competition requirements." Corel Corp. v. United States, 165 F. Supp. 2d at 20; see also Navarro Research and Eng'g, Inc. v. United States, 94 Fed. Cl. 224, 227-28 (2010) ("A multiple task

order allows an agency to select a contractor and secure certain contract terms through an initial competitive process, but to make subsequent orders pursuant to that contract without going through the competitive process. 'In other words once the task or delivery order contract itself has been obtained through full and open competition, orders made pursuant to that contract are immune from CICA's full and open competition requirements,'" although the court noted in a footnote the exception of certain enhanced competitive procedures for high value task orders over $5,000,000.00 now statutorily mandated. (citing Corel Corp. v. United States, 165 F. Supp. 2d at 20)) (internal footnotes omitted).

As a counterbalance to the streamlined procedures, FASA also established that each contract awardee eligible for the task orders issued, shall be provided a fair opportunity to be considered for task orders in excess of $2,500.00 issued under a multiple-award, ID/IQ contract, with limited exceptions. 10 U.S.C. § 2304c(b) ("When multiple task or delivery order contracts are awarded . . . , all contractors awarded such contracts shall be provided a fair opportunity to be considered, pursuant to procedures set forth in the contracts, for each task or delivery order in excess of $2,500 that is to be issued under any of the contracts [unless one of the exceptions [10] applies].") In implementing FASA, the FAR gives the contracting officer broad discretion to establish task order placement procedures, yet it also lists certain procedures that must be followed to provide a fair opportunity to each awardee, such as stating the agency's requirements, and including the procedures in the solicitation and contract. See 48 C.F.R. (FAR) 16.505(b)(1)(ii)(D) (2013). [11]

---

[10] These exceptions include if:

> (1) the agency's need for the services or property ordered is of such unusual urgency that providing such opportunity to all such contractors would result in unacceptable delays in fulfilling that need;
>
> (2) only one such contractor is capable of providing the services or property required at the level of quality required because the services or property ordered are unique or highly specialized;
>
> (3) the task or delivery order should be issued on a sole-source basis in the interest of economy and efficiency because it is a logical follow-on to a task or delivery order already issued on a competitive basis; or
>
> (4) it is necessary to place the order with a particular contractor in order to satisfy a minimum guarantee.

10 U.S.C. § 2304c(b) (2012).

[11] FAR 16.505 (b)(1) provides:

_____

(b) Orders under multiple-award contracts--

(1) Fair opportunity.

> (i) The contracting officer must provide each awardee a fair opportunity to be considered for each order exceeding $3,000 issued under multiple delivery-order contracts or multiple task-order contracts, except as provided for in paragraph (b)(2) of this section.

> (ii) The contracting officer may exercise broad discretion in developing appropriate order placement procedures. The contracting officer should keep submission requirements to a minimum. Contracting officers may use streamlined procedures, including oral presentations. If the order does not exceed the simplified acquisition threshold, the contracting officer need not contact each of the multiple awardees under the contract before selecting an order awardee if the contracting officer has information available to ensure that each awardee is provided a fair opportunity to be considered for each order. The competition requirements in part 6 and the policies in subpart 15.3 do not apply to the ordering process. However, the contracting officer must--

>> (A) Develop placement procedures that will provide each awardee a fair opportunity to be considered for each order and that reflect the requirement and other aspects of the contracting environment;

>> (B) Not use any method (such as allocation or designation of any preferred awardee) that would not result in fair consideration being given to all awardees prior to placing each order;

>> (C) Tailor the procedures to each acquisition;

>> (D) Include the procedures in the solicitation and the contract; and

>> (E) Consider price or cost under each order as one of the factors in the selection decision.

FAR 16.505(b)(i)-(ii).

FASA also provides for "ENHANCED COMPETITION FOR ORDERS IN EXCESS OF $5,000,000" (capitalization in original), indicating that:

> the requirement to provide all contractors a fair opportunity to be considered under subsection (b) is not met unless all such contractors are provided, at a minimum--
>
> (1) a notice of the task or delivery order that includes a clear statement of the agency's requirements;
>
> (2) a reasonable period of time to provide a proposal in response to the notice;
>
> (3) disclosure of the significant factors and subfactors, including cost or price, that the agency expects to consider in evaluating such proposals, and their relative importance;
>
> (4) in the case of an award that is to be made on a best value basis, a written statement documenting the basis for the award and the relative importance of quality and price or cost factors; and
>
> (5) an opportunity for a post-award debriefing consistent with the requirements of section 2305(b)(5) of this title.

10 U.S.C. § 2304c(d) (2012); see also FAR 16.505(b)(1)(iv)-(v).[12]

---

[12] FAR 16.505(b)(1) provides:

> (iv) Orders exceeding $5 million. For task or delivery orders in excess of $5 million, the requirement to provide all awardees a fair opportunity to be considered for each order shall include, at a minimum--
>
> > (A) A notice of the task or delivery order that includes a clear statement of the agency's requirements;
> >
> > (B) A reasonable response period;
> >
> > (C) Disclosure of the significant factors and subfactors, including cost or price, that the agency expects to consider in evaluating proposals, and their relative importance;
> >
> > (D) Where award is made on a best value basis, a written statement documenting the basis for award and the relative importance of quality and price or cost factors; and

(E) An opportunity for a postaward debriefing in accordance with paragraph (b)(6) of this section.

(v) The contracting officer should consider the following when developing the procedures:

(A)(1) Past performance on earlier orders under the contract, including quality, timeliness and cost control.

(2) Potential impact on other orders placed with the contractor.

(3) Minimum order requirements.

(4) The amount of time contractors need to make informed business decisions on whether to respond to potential orders.

(5) Whether contractors could be encouraged to respond to potential orders by outreach efforts to promote exchanges of information, such as--

(i) Seeking comments from two or more contractors on draft statements of work;

(ii) Using a multiphased approach when effort required to respond to a potential order may be resource intensive (e.g., requirements are complex or need continued development), where all contractors are initially considered on price considerations (e.g., rough estimates), and other considerations as appropriate (e.g., proposed conceptual approach, past performance). The contractors most likely to submit the highest value solutions are then selected for one-on-one sessions with the Government to increase their understanding of the requirements, provide suggestions for refining requirements, and discuss risk reduction measures.

(B) Formal evaluation plans or scoring of quotes or offers are not required.

FAR 16.505(b)(iv)-(v).

As noted above, FASA provides that under a multiple-award, ID/IQ contract, "[a] protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order" except for two exceptions. The first exception is "a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued[.]" 10 U.S.C. § 2304c(e)(1)(A). The second exception is "a protest of an order valued in excess of $10,000,000[,]" for which the statute provides the Comptroller General of the United States with exclusive jurisdiction. See 10 U.S.C. §§ 2304c(e)(1)(B), 2304c(e)(2).

If, however, protestor's claim is challenging the failure under the "umbrella," multiple award contract by the agency to be provided a fair opportunity to be considered for task order solicitations,[13] under certain circumstances, that claim could be in the nature of a breach of contract claim, not a standard bid protest claim. The Tucker Act provides jurisdiction in this court over bid protests,[14] generally when an interested party objects to a solicitation or contract award. See 28 U.S.C. § 1491(b)(1) (2012). By its terms, the FASA prohibition on bid protests does not apply to a breach of contract claim. As one

---

[13] Protestor asserts in its opposition brief to the motion to dismiss that Solicitation N00024-14-R-3154 was under "the Navy's SeaPort Multiple Award ('MAC') contracts" and that "the original SeaPort MACs were awarded on or about April 5, 2004." Defendant adds in its motion to dismiss that the "delivery order contract issued under the SeaPort-e Multiple Award Indefinite Delivery Indefinite Quantity (IDIQ) Program."

[14] The FAR defines "bid protest," as follows:

> Protest means a written objection by an interested party to any of the following:
>
> (1) A solicitation or other request by an agency for offers for a contract for the procurement of property or services.
>
> (2) The cancellation of the solicitation or other request.
>
> (3) An award or proposed award of the contract.
>
> (4) A termination or cancellation of an award of the contract, if the written objection contains an allegation that the termination or cancellation is based in whole or in part on improprieties concerning the award of the contract.

FAR 33.101 (Definitions) (2013).

commentator on government contracts stated:

> Although contractors under multiple award IDIQ contracts cannot
> protest the award of a task or delivery order, it does not follow that
> they cannot pursue a claim under the CDA [Contract Disputes Act]
> when they think that the Government has breached its promise to
> give them a fair opportunity to be considered for an order.  Protests
> and claims are very different things in terms of their objectives, the
> remedies available, and their effect on Government operations.

Vernon J. Edwards, *Postscript: Breach of Loss of the Fair Opportunity to
Compete*, 20 No. 12 Nash & Cibinic Report ¶ 59, at 2, 7 (Dec. 2006); <u>see</u> <u>also</u>
<u>ABF Freight Sys., Inc. v. United States</u>, 55 Fed. Cl. 392, 397 (2003) (dismissing
three plaintiffs who had brought a bid protest, although all three had received
contract awards, and stating: "The court does not see how a plaintiff asserting
claims pertaining to a contract it has made with the government could be a
'disappointed bidder' for bid protest purposes. . . . Rather, such a plaintiff is a
contractor asserting a claim 'relating to a contract' and is subject to the Contract
Disputes Act jurisdiction of this court, as set forth in 41 U.S.C. § 609.") (internal
citations omitted).

In <u>A & D Fire Protection v. United States</u>, the court offered its opinion in
dicta on a bid protest case as to whether it would have had jurisdiction under the
CDA and the Tucker Act had plaintiff A & D alleged a breach of contract, based
on the fair opportunity procedures incorporated into the plaintiff's contract. <u>See</u> <u>A
& D Fire Protection v. United States</u>, 72 Fed. Cl. at 128, 135. The <u>A & D</u> court did
not have to directly address the issue because, as the court wrote, "[e]ven
assuming CDA jurisdiction would lie for this suit, plaintiff has not alleged that a
contract claim has been presented to the contracting officer," which the court
noted prohibits jurisdiction in the Court of Federal Claims.  <u>See</u> <u>id.</u> at 135.  The <u>A
& D</u> court wrote

> as a general matter, the court does not agree with the theory that
> actions, that are in essence bid protests of task order awards, can
> be re-characterized as contract disputes in order to create
> jurisdiction in this court or in an agency board of contract appeals.
> *But see* Ralph C. Nash & John Cibinic, *Task Order Contracts: The
> Breach of Loss of the Fair Opportunity to Compete*, 16 No. 10 Nash
> & Cibinic Report 49 (Oct. 2002) ("Taking a case to the agency
> board of contract appeals appears to be a viable way to contest the
> lack of a fair opportunity to compete for task orders.").  Such a
> stratagem attempts to evade the bar of task order bid protests
> clearly enunciated in Section 253j(d). *But see* <u>Cmty. Consulting
> Int'l</u>, ASBCA 53489, 02-2 BCA ¶ 31940, 2002 WL 1788535 (Aug. 2,
> 2002) (finding that a contract clause assuring a fair opportunity to
> compete for task orders gave the board jurisdiction, and finding no

---

indication in FASA that "Congress explicitly carved out multiple award, task order contracts as an exception to [the board's] Contract Disputes Act jurisdiction"). The court does not find that this type of bid protest action would fall within its CDA jurisdiction.

Id.

Although the court is reluctant to quote itself, in <u>Digital Technologies, Inc. v. United States</u>, 89 Fed. Cl. 711 (2009), that case is directly on point for this court's jurisdiction over task order claims. In <u>DTI</u>, the plaintiff contended "that defendant breached its contract with plaintiff because Customs did not provide a fair opportunity to compete for a ten-month task order issued in November 2006 or allow plaintiff to be considered for additional task orders after November 2006[.]" <u>Id.</u> at 719. In <u>DTI</u>, plaintiff argued that, "by its terms, the restriction in FASA [did] not apply because DTI ha[d] asserted a breach of contract claim, not a bid protest." <u>Id.</u> at 722. In <u>DTI</u>, plaintiff insisted it was not objecting to the award of any task order, requesting injunctive relief, seeking to compel a performance stay, or seeking to cancel a task order award. <u>See id.</u> Plaintiff alleged that it was denied a fair opportunity to compete and to be considered for the work contemplated in plaintiff's ID/IQ master contract. <u>See id.</u> at 728. Specifically, the DTI plaintiff claimed in its complaint that it was:

> denied a fair opportunity to compete under the contract it had been awarded, and to be considered for the work contemplated in DTI's contract, in that the government engaged in an improper auction through disclosure of DTI's unit pricing information; the government's decision to compete task orders directly contradicted earlier assurances that it would not compete the work unless DTI, as the incumbent, had 'severe performance difficulties'; the government inaccurately described the scope of work of task orders being competed, adversely impacting DTI, while the correct scope of work was known to ATI [DTI's competitor who was awarded the task order at issue]; the short time frame for bidding on the November 2006 ten-month task order was designed by the government with the intent of awarding the task order contract to ATI, whose master contract would have prohibited ATI from receiving an award after December 1, 2006; and the November 2006 task order solicitation was designed to deny work to DTI.

<u>Id.</u> at 722. The <u>DTI</u> case was not a classic bid protest and the remedy sought was not a classic protest remedy. The DTI plaintiff alleged a breach of contract of its master ID/IQ contract and asserted jurisdiction under the CDA and section 1491(a)(1) of the Tucker Act. <u>See id.</u> at 726. Plaintiff also had met "the jurisdictional prerequisites of having first submitted a written certified claim to the agency contracting officer, . . . obtained a final decision from the contracting officer, who denied the claim and, in fact, informed DTI that it may appeal to the

17

Civilian Board of Contract Appeals or file a claim in this court." <u>Id.</u> at 729-30.

Protestor Orbis does not argue that its claims meet one of the exceptions in the FASA statute to the general jurisdictional bar on protests. Regarding the first exception, permitting "a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued," 10 U.S.C. § 2304c(e)(1)(A), protestor did not allege, and conceded at the July 14, 2014 hearing, that, it was not arguing that the task order exceeded the scope, period, or maximum value of the umbrella contract. Regarding the second exception for "a protest of an order valued in excess of $10,000,000," the specific task order at issue here, as alleged in the complaint, is valued at $6,133,033.00, and, thus, is not in excess of $10,000,000.00.

Addressing the jurisdictional issue in <u>DTI</u>, the undersigned concluded, without addressing whether a breach had occurred, that:

> Because FASA, by its terms, only prohibits task order protests, this court has jurisdiction to hear Counts II (fair opportunity to compete) and III (fair opportunity to be considered for additional work) of the complaint regarding the alleged breach of the fair opportunity provisions of DTI's contract.

<u>Digital Techs., Inc. v. United States</u>, 89 Fed. Cl. at 730. The <u>DTI</u> decision also stated:

> DTI is not challenging the issuance or proposed issuance of a task order, but seeks monetary damages based on an alleged breach of specific contractual language on ordering provisions in its ID/IQ contract with the government. . . . Congress has not repealed the jurisdiction of this court to address master ID/IQ breach of contracts claims, and this court declines to act on the government's invitation to partially repeal its CDA jurisdiction by implication. Therefore, because the present dispute has been properly asserted, because the jurisdictional prerequisites have been met, because the claim is tied to specific contractual provisions in DTI's contract with the government, and concerns the administration of DTI's master ID/IQ contract, the court finds that the dispute can be brought in this court as a breach of contract claim.

<u>Id.</u>

During the July 14, 2014 hearing in the above captioned case, the court reviewed the complaint with protestor's counsel count by count and confirmed with counsel that each count alleged by Orbis was a challenge to the evaluation of the protestor's submission in response to the Solicitation, or a related claim for declaratory and injunctive relief. During repeated discussion with the court at the

hearing, protestor conceded that the claims filed by Orbis are not breach of contract claims of the umbrella contract, but are "straight bid protest."

## CONCLUSION

Based on the above analysis and discussion, the protest filed by Orbis challenging the Navy's evaluation of the Orbis proposal responding to Solicitation N00024-14-R-3154 is barred by the language of the FASA statute at 10 U.S.C. § 2304c(e). The Protestor's protest is **DISMISSED**, without prejudice. The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**